In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00081-CR
______________________________


WARREN KEITH RODGERS, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 402nd Judicial District Court
Wood County, Texas
Trial Court No. 16,940-2001


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Warren Keith Rodgers was convicted by a Wood County jury for the murder of his
wife, Amanda. The indictment alleged, in two paragraphs, that Rodgers killed Amanda by
placing her on a railroad track so she would be hit by a train and by driving over her with
a vehicle. The jury convicted Rodgers of murder, as alleged in both paragraphs, and
assessed his punishment at life in prison and a $10,000.00 fine. The trial court sentenced
Rodgers in accordance with the jury verdict.
          Rodgers appeals, asserting: 1) the evidence is legally and factually insufficient;
2) the State's expert regarding tire and shoe prints was not qualified "under Daubert,



Robinson


 and Kelly,


" and Rodgers' due process rights were violated by the expert's
testimony; 3) the protections of the Fourth Amendment and Article 38.23 of the Code of
Criminal Procedure


 were violated by the issuance and execution of a search warrant for
Rodgers' home and vehicle; 4) the trial court erred in its refusal to grant a change of venue;
5) the trial court erred by denying Rodgers' request for inclusion of a lesser included
offense in the jury charge; 6) Rodgers was deprived of his rights to due process and a fair
and impartial jury by the district clerk's solicitation of members of the jury panel to donate
their jury pay to child and victim compensation funds, and by the trial court's denial of
additional strikes resulting in the seating of a juror who had so contributed her jury pay; and
7) Rodgers' confrontation rights under the Sixth Amendment were violated by the
admission into evidence of statements attributed to Amanda. We affirm the judgment.
Legal Sufficiency of the Evidence
          In our review of the legal sufficiency of the evidence, we employ the standards set
forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979). This calls on the court to view the
relevant evidence in the light most favorable to the verdict and determine whether any
rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In our
review, we must evaluate all of the evidence in the record, both direct and circumstantial,
whether admissible or inadmissible. Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim.
App. 1999). 
          The evidence, viewed in the light most favorable to the jury verdict, showed that, at
the time of Amanda's death, she and Rodgers had been separated for approximately a
month. Amanda had told people she was afraid of Rodgers. Shortly before her death, she
approached her grandmother, Wanda Wilson, for a place to stay, explaining that the time
was coming when she (Amanda) would have to "hide out" from Rodgers. 
          Amanda was employed at Wal-Mart in the city of Mineola. After completion of her
shift June 21, 2001, she went to her white Ford Tempo parked in the store's parking lot. 
After loading her groceries, she found her car would not start. Evidence was subsequently
adduced that the wires connecting the Tempo's spark plugs and coil had been cross-wired,
rendering the vehicle inoperable. Coworker Penny Canfield testified that, on June 21, she
was leaving Wal-Mart around 9:00 p.m. and passed Amanda coming back into the store. 
Amanda commented that her car would not start. Canfield offered to help, but Amanda
told her Rodgers was there. Canfield testified she saw Rodgers sitting in his van in front
of the store. Hampton Rayburn, another coworker at Wal-Mart, testified Amanda had been
confiding in him for several months about her marital problems. She told Rayburn that
Rodgers had threatened to kill her and that she was terrified of him. On the evening of
Amanda's death, Rayburn saw Amanda after her shift and she told him her car would not
start. Rayburn testified Amanda made a couple of telephone calls and then went to check
on her car again. Amanda returned inside the store and told Rayburn, "the asshole is
here." When Rayburn asked who she meant, she indicated Rodgers. Amanda told
Rayburn she intended to tell Rodgers that things were over between them, and if he did
not understand, she was leaving anyway. Rayburn told her to be careful and gave her his
pocketknife, which she put in her right front pocket. 
          A surveillance videotape of the Wal-Mart parking lot, recorded June 21, 2001, and
covering the time between approximately 6:32 p.m. and 9:11 p.m., was admitted into
evidence. The videotape was played for the jury, and Wal-Mart's security officer, Roger
Copeland, narrated what was depicted on the videotape while it was played. He testified
the videotape shows a dark van approaching a white car parked on the parking lot. A
person gets out of the van and raises the hood on the white car. After closing the hood,
the person gets back into the van and leaves the parking lot. Later, another person can
be seen approaching the white car, placing items in the back seat, or possibly in the trunk. 
This person then returns to the store. The videotape then shows a white pickup truck, as
well as the same van as had been shown earlier, approaching the white car. The van can
then be seen leaving the parking lot. 
          Joe Don McClenney testified he saw Amanda and Rodgers in the parking lot that
night. He identified them from a picture of the couple. McClenney was driving the white
pickup truck seen in the videotape. He said he saw Rodgers working under the hood of
Amanda's white Tempo. McClenney, a mechanic by trade, offered to help the couple. 
Rodgers declined McClenney's offer. 
          Neighbors at the apartments in the town of Alba, where Amanda lived, testified
Amanda had not come home from work the night of June 21, but had called and told them
she was getting a ride from Rodgers. Stephanie Cantrell, Amanda's neighbor at the
apartments, testified Rodgers called her on the afternoon of June 21 and told her Amanda
was "messing with another woman." He said that he was an electrician and that he could
tamper with Amanda's car or her house. Rodgers also told Cantrell that he had relatives
in the "Westside Mafia" and that he could have Amanda "picked off." 
          Mark Burrell worked with Rodgers and testified that on June 21, after work, the two
drove to Big Sandy for beer and liquor. During the trip, Rodgers talked about his marital
problems and said he could alter the wiring on Amanda's car such that, when she engaged
the car's cruise control, the steering would lock and the driver would lose control of the car. 
Burrell testified there was no blood in the van when he rode with Rodgers to the liquor
store.
          William Cooksey, an engineer for Union Pacific Railroad, testified that, on the night
of June 21 or early morning of June 22, 2001, he was operating a train as it approached
the crossing of a county road in Mineola, where he observed a woman, later identified as
Amanda, lying on the tracks. Cooksey recalled that the woman was not moving. He could
not remember how she was dressed, but did recall she had no shoes on her feet. When
he saw her, he put the train in "full service reduction," but was unable to stop before hitting
her. It took him about a mile to get the train completely stopped. He then dialed 9-1-1 and
reported what had happened. 
          Sheila Spotswood, M.D., the medical examiner who performed the autopsy on
Amanda's body, described various serious wounds. There were multiple abrasions all over
the front of her body, and a significant laceration from the left side of her body to her left
thigh, which almost amputated her left leg. Her spleen and liver were lacerated. Her skull
was fractured, as were her ribs, right collarbone, and bones in her arms and legs. 
Spotswood agreed that these injuries were consistent with Amanda being hit by a train and
that at least some of the injuries were consistent with her being run over by a motor vehicle
such as a van. 
          Lieutenant Miles Tucker of the Wood County Sheriff's Office went to the scene in
response to Cooksey's 9-1-1 call. There, he found Amanda's body about fifty feet from the
railroad tracks. She was tentatively identified via a partial Wal-Mart pay stub found nearby. 
          In the process of trying to positively identify the body, law enforcement officers
sought to locate Amanda's husband, Rodgers. They were able to determine he lived with
his mother at her residence in Mineola. Around daybreak on the morning of June 22,
Deputy William Burge, Tucker, and Investigator Kyle Henson, all with the Wood County
Sheriff's Office, went to this residence. Henson went to the front door of the house, and
Burge went to the back of the house. Burge entered the back yard through an open gate
and observed a green van parked behind the house. The officers already had information
that Rodgers drove a vehicle of that description. Burge looked through a window of the
van, where he observed what he believed was blood on the back of the driver's seat. He
looked through another window and saw what he thought was more blood. He then went
to the front of the house where Henson was talking to Rodgers. Burge privately informed
Henson of his observations in the van. Henson terminated his interview with Rodgers and
left to obtain a search warrant. 
          Pursuant to the search warrant issued by a district judge, the officers seized the
shoes Rodgers was wearing on the morning of June 22. Amanda's blood was found on
one shoe. The green van parked in the back yard was also seized pursuant to this warrant
and towed to the sheriff's office for processing. Although Amanda and Rodgers owned
both vehicles together, Rodgers primarily drove the van and Amanda the Tempo. Of the
items seized from inside the van, Amanda's blood was found on the driver's back seat
cover, a rear floor mat, a rear air conditioning vent, the back of the front passenger's seat,
and a piece of paper. 
          The State's expert witness on tires and shoes, A. J. Jumper, testified that a shoe
print photographed near the railroad tracks where Amanda's body was found had similar
characteristics and design as one of the shoes Rodgers was wearing on the early morning
of June 22. He further testified that two tire tracks photographed at the same location had
similar characteristics and design as three tire impressions taken from Rodgers' van. The
State's DNA expert testified there were "consistencies" between a sample of Amanda's
DNA and the hair found under Rodgers' van. He said two of the strands of hair found at
that location could be identified as Amanda's to the extent of one in 4,052.
          Viewed in the light most favorable to the jury verdict, we hold that a rational trier of
fact could have found the essential elements of murder beyond a reasonable doubt. The
evidence is legally sufficient to support Rodgers' conviction. 
 

Factual Sufficiency of the Evidence
          In a factual sufficiency review, an appellate court views all the evidence in a neutral
light and determines whether the evidence supporting the verdict is too weak to support
the finding of guilt beyond a reasonable doubt or if evidence contrary to the verdict is
strong enough that the beyond-a-reasonable-doubt standard could not have been met. 
Threadgill v. State, 146 S.W.3d 654, 664 (Tex. Crim. App. 2004) (citing Zuniga v. State,
144 S.W.3d 477, 486 (Tex. Crim. App. 2004)). If the evidence is factually insufficient, then
we must reverse the judgment and remand for a new trial. Clewis v. State, 922 S.W.2d
126, 135 (Tex. Crim. App. 1996).
          Contravening the evidence supporting Rodgers' conviction was Rodgers' statement
to Henson in the early morning of June 22 that he had picked up Amanda at Wal-Mart the
night before, but she jumped from his van at the red light near Wal-Mart and got into the
truck of another man. Further, Jumper, the State's expert witness on tires and shoes,
testified he could not state as a fact that the shoe print and the tire tracks photographed
at the railroad scene were made by Rodgers' shoe or the tires on his van. Also, the State's
DNA expert testified he could not conclusively determine that human hair found on the
undercarriage of Rodgers' van belonged to Amanda.


 
          Viewing the evidence in a neutral light, we cannot say the evidence supporting the
verdict, considered alone, is too weak to support the jury's finding of guilt beyond a
reasonable doubt. Likewise, after weighing the evidence supporting the jury verdict, and
the contravening evidence, we conclude the contrary evidence was not strong enough that
the State could not have met its burden of proof. The evidence was factually sufficient to
support the jury verdict.
The State's Expert Witness
          Rodgers contends Jumper, the State's expert witness on shoes and tires, was not
qualified "under Daubert, Robinson and Kelly." The State called Jumper as a witness to
compare the sole of Rodgers' shoe and tire imprints from his van with impressions made
from a shoe print and tire tracks found near the railroad tracks where Amanda was hit by
the train. 
          Rodgers filed a pretrial motion requesting a hearing outside the presence of the jury
on all expert witnesses. The trial court instructed Rodgers to make his request for a "Rule
702 hearing" during trial. Rodgers failed to timely request such a hearing. 
          Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the
trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702.

          This rule requires scientific evidence to be reliable and relevant. See Daubert, 509
U.S. at 589. To be reliable, three criteria must be met: (1) the underlying scientific theory
must be valid; (2) the technique applying the theory must be valid; and (3) the technique
must have been properly applied on the occasion in question. All three criteria must be
proven to the trial court outside the presence of the jury before the evidence is admitted. 
Kelly, 824 S.W.2d at 573. The burden is on the proponent of the expert testimony to prove
by clear and convincing evidence that the testimony is trustworthy. Id. We review the trial
court's decision under an abuse of discretion standard, which means the decision must be
within the zone of reasonable disagreement in light of the evidence offered at the hearing
and the requirements of Rule 702. Id. at 574.
          In the instant case, Rodgers admitted at trial the State had timely provided copies
of Jumper's resume and report. He did not object when the State called Jumper to testify. 
On direct examination, the State established that Jumper is a latent print examiner for the
Dallas County Southwestern Institute of Forensic Sciences (SWIFS). He testified that the
following training and experience qualify him for this position: 
 
          ∙         Two years' training in the physical evidence section of the Dallas County
Sheriff's Office
 
          ∙         Seven years' apprenticeship with a certified print examiner
 
          ∙         Classes with the Dallas County Sheriff's Department on the matching of shoe
and tire imprints
 
          ∙         Courses at the University of North Texas on the detection, collection,
preservation, and examination of shoe and tire imprints
 
          ∙         A class with the former section chief of the FBI's "shoe imprint section on
tires" [sic]
 
          ∙         A class on tire track imprints comparison and recovery, taught at an FBI
educational conference by a retired member of the Florida Department of
Public Safety
 
          When asked by the State if he was able to take a tire print or shoe print and make
comparisons between an item from a crime scene and some other item or known item later
located, Jumper answered, without objection, in the affirmative. He then stated he had
testified in court more than 150 times.
          Just as the State was beginning to ask Jumper questions concerning items of
evidence in the instant case, Rodgers requested to question the witness on voir dire "to
test his qualifications under 702." Rodgers' request was granted, and, in a lengthy
interrogation in the presence of the jury, further established the following regarding
Jumper's background:
          ∙         He graduated from high school but not from college
 
          ∙         There were only two trials in which he testified as to tire prints
 
          ∙         He has written no articles discussing tire prints
 
          ∙         The course he took at the University of North Texas was a three-day course
taught by a former section chief for the FBI's footwear and tire imprint section
 
          ∙         In 1989, he took a three-day course at the Dallas County Sheriff's Academy
on comparison of shoe and tire imprints taught by a detective in the physical
evidence section of the Sheriff's Department
 
          ∙         In 1991, he took another three-day course at the Dallas County Sheriff's
Academy on matching shoe and tire imprints 
 
          ∙         In 1993, he took another three-day training course at the Sheriff's
Department on "the recovery and examination of shoe and tires" [sic]
 
          ∙         He had two years' (1987–1989) on-the-job training as a crime scene
detective in the physical evidence section of the Dallas County Sheriff's
Department
 
          ∙         At his current employment with SWIFS, he is required to take a test on
comparisons of shoe imprints every year
 
          ∙         His job at SWIFS is to examine fingerprints, shoes, and tires, but the bulk of
his work is with fingerprints
 
          ∙         During the five years he has worked at SWIFS, he has not testified in any
other case regarding tire prints
 
          ∙         In 1998, he took a two-day course dealing specifically with tires at an
educational conference presented by the International Association for
Identification
 
          At the end of this voir dire questioning, Rodgers approached the bench, stated he
had no further questions on his "Daubert challenge," and made the following objection
outside the hearing of the jury:
My objection is he's not qualified under Daubert or Kelly. He doesn't meet
the qualifications by any level of standard. If he's going to testify to scientific
testing that he's familiar, well, maybe he's qualified to express an opinion on
taking a tire print and matching it to an individual tire or even a class of tires,
I don't see how any way that a grand total of 14 days of classroom training
on any subject period would make anyone an expert any time when that
leaves his work qualifications which although respectful are limited to two
years of training through a supervisor and supervisor [sic] and on the job and
followed by just sort of on the job training. He's already testified he's only
testified twice, he's only made two reports.

                     . . . .
 
                     . . . . He doesn't meet the qualifications of 702 or 703.




          The trial court overruled Rodgers' objection, and the State continued with its direct 
examination of Jumper, eliciting opinions from him, without further objection, that the shoe
and tire prints photographed at the scene and the impressions from Rodgers' shoes and
tires had similar characteristics and designs. After a weekend recess of the trial, Rodgers
conducted a lengthy and detailed cross-examination of Jumper, much of it outside the
presence of the jury, during which Rodgers made a strong challenge to Jumper's general
knowledge of tires and shoes. Rodgers' "Daubert, Robinson and Kelly" issues on appeal
are largely based on the testimony developed during this cross-examination. Fatal to his
contentions, however, is that this testimony came after Jumper had already expressed his
opinions before the jury. 
          There is a three-pronged test for the admissibility of expert testimony: (1) the expert
must be qualified by knowledge, skill, expertise, training, or education; (2) the subject
matter of the testimony must be an appropriate one for expert testimony; and (3) the
expert's testimony must assist the trier of fact to understand the evidence or decide a fact
in issue. Hardin v. State, 20 S.W.3d 84, 91 (Tex. App.—Texarkana 2000, pet. ref'd); Bui
v. State, 964 S.W.2d 335, 344 (Tex. App.—Texarkana 1998, pet. ref'd). At the time
Jumper first expressed his opinions concerning his comparison of the shoe and tire prints
photographed at the scene with the impressions made from Rodgers' shoes and tires,
Rodgers had only challenged him under the first prong of this test. Rodgers' challenges
under the other two prongs came later, during cross-examination, and were not before the
trial court when it ruled on Jumper's qualifications. 
          Further, at the time of the court's ruling, Rodgers had asked no questions of Jumper
concerning the three reliability criteria of Daubert. Neither had he reasserted, as required
by the trial court's pretrial ruling, his request for a hearing outside the presence of the jury
to so question the witness. By this failure, Rodgers forfeited his right to such a hearing. 
See Scherl v. State, 7 S.W.3d 650, 655 (Tex. App.—Texarkana 1999, pet. ref'd). Based
on the evidence before the trial court at the time of its ruling on Jumper's qualifications, no
abuse of discretion has been shown. Rodgers' issues "under Daubert, Robinson and
Kelly" are overruled. 
Due Process Violation
          Rodgers further alleges that Jumper's testimony as an expert witness violated the
Due Process Clause of the United States Constitution and that Rodgers was thereby
harmed. Rodgers does not provide any authority or argument on how his due process
rights were violated. His argument centers on the alleged deficiencies in Jumper's
qualifications elicited during cross-examination. He argues and cites cases addressing
Rule 702 and the Daubert/Kelly line of cases, but offers no argument or authority why such
purported error amounts to a due process violation. We find this point of error
inadequately briefed and decline to address it. See Tex. R. App. P. 38.1(h); Vuong v.
State, 830 S.W.2d 929, 940 (Tex. Crim. App. 1992).
Search and Seizure
          The State's evidence showed that, during the early morning hours of June 22, 2001,
the date Amanda's body was found, officers went to the home of Rodgers' mother, where
Rodgers lived. At that point in time, the officers had found Amanda's pay stub near her
body, but had not positively identified the body.


 The officers testified they went to
Rodgers' mother's house, where Rodgers was staying, as part of their investigation seeking
to positively identify Amanda. As noted earlier, while Henson went to the front door of this
residence, Burge went to the back yard, entering through an open gate, and observed a
green van parked behind the house. Burge looked through the windows of the van, where
he observed what he believed was blood inside. He then went to the front of the house
and informed Henson of his observations. Henson immediately left that location to get a
search warrant. A district judge issued the warrant on that same date authorizing a search
of Rodgers' van and his mother's house. 
          Rodgers contends Burge's initial look through the van windows was an illegal
warrantless search. The trial court concluded it was not, and we agree. The van was
inside the back gate of Rodgers' mother's yard. Burge testified the gate was open
"approximately 3, 4 feet" and at least one side of the yard was not enclosed by a fence. 
          An officer's entry onto the curtilage or approach to the entrances of a residence
does not necessarily rise to the level of a search as contemplated by the Fourth
Amendment. Cf. Long v. State, 532 S.W.2d 591, 594–95 (Tex. Crim. App. 1975) (sheriff
and deputy with questions about private aircraft flights in area received no answer to front
door, walking to back door smelled marihuana, which could also be seen through open
window; observance of marihuana through window held not a search); Atkins v. State, 882
S.W.2d 910 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (officer investigating
anonymous tip had to pass through fence to get to back door; appellant left house by way
of back door, observed officer, dropped an object, and thereafter re-entered house; officer
picked up object and recognized it as contraband; seizing object held not a search);
Washington v. State, 152 S.W.3d 209, 214–15 (Tex. App.—Amarillo 2004, no pet. h.)
(officers responded to Housing Authority report of persons smoking marihuana; officers
drove to back of property and entered through open gate; entry through open gate held not
a search). An officer may enter the curtilage of a house in an effort to contact its
occupants. Buchanan v. State, 129 S.W.3d 767, 773 (Tex. App.—Amarillo 2004, pet.
ref'd). This is true when the occupant has not manifested his or her intent to restrict access
by locking a gate or posting signs informing the officer he or she is not invited or the officer
does not deviate from the normal path of traffic. Id. 
          The trial court's ruling in the instant case that Burge's initial look through the van
windows was not a search was based on evidence the fence on one side of the back yard
did not enclose the property, the gate to the back yard was open, and the yard and van
were within plain view from the street. We agree and hold that Burge's looking through the
van windows was not a search. 
          Rodgers also complains the warrant authorizing the search of his van and his
mother's house was vague to the point of being a general warrant and was therefore
insufficient for Fourth Amendment purposes. He contends, "The warrant application did
not identify particular items to be seized and instead authorized a general search of
Rodgers' home and van." 
          The Fourth Amendment's requirement that a warrant "particularly describe the place
to be searched, and the persons or things to be seized" repudiates general warrants and
"makes general searches . . . impossible and prevents the seizure of one thing under a
warrant describing another." Long v. State, 132 S.W.3d 443, 448 n.12 (Tex. Crim. App.
2004). "Of course, '[a] search made under authority of a search warrant may extend to the
entire area covered by the warrant's description.' And, when courts examine the
description of the place to be searched to determine the warrant's scope, they follow a
common sense and practical approach, not a 'Procrustean' or overly technical one." Id.
at 448 (citations omitted); see also Ramos v. State, 934 S.W.2d 358 (Tex. Crim. App.
1996) (warrant authorizing, per application affidavit, officers to search for "blood, clothing
containing blood . . . and any and all evidence relating to a homicide and/or a kidnapping,"
where only items seized and subsequently used in investigation or trial were items
containing blood, held harmless beyond reasonable doubt).
An officer may seize mere evidence of a crime even though such
property is not particularly described in the search warrant when the objects
discovered and seized are reasonably related to the offense in question,
when the officer at the time of the seizure has a reasonable basis for drawing
a connection between the observed objects and the crime which furnished
the basis for the search warrant, and the discovery of such property is made
in the course of a good faith search conducted within the perimeters of the
search warrant.

Bower v. State, 769 S.W.2d 887, 906 (Tex. Crim. App. 1989), overruled on other grounds,
Heitman v. State, 815 S.W.2d 681 (Tex. Crim. App. 1991). 
          An appellant, when alleging a general warrant was issued, must point to specific
evidence seized pursuant to the complained-of paragraph and offered into evidence. 
Massey v. State, 933 S.W.2d 141, 148 (Tex. Crim. App. 1996). "In failing to identify
evidence that was seized pursuant to the complained of portion of the affidavit, appellant
has inadequately briefed this issue and therefore failed to preserve his claim for review."
Id.
          The application seeking a search warrant for Rodgers' van and his mother's home
alleged that: 1) a specific offense had been committed; 2) the specifically described
property or items that were to be searched for or seized constituted evidence of that
offense or evidence that a particular person committed that offense; and 3) the property
or items constituting evidence to be searched for or seized were located at or on the
particular person, place, or thing to be searched. See Tex. Code Crim. Proc. Ann. art.
18.01 (Vernon Supp. 2004–2005).
          Henson's sworn application stated that the officer was conducting a homicide
investigation into Amanda's death; that, on trying to locate her husband and notify a family
member for identification purposes, blood was seen in Rodgers' van; that Rodgers told
officers he had not seen Amanda since the previous night; that Amanda's stepfather told
officers Rodgers and Amanda had marital difficulties; and that clay on the van tires looked
similar to that seen at the railroad crossing where Amanda's body was found. The affidavit
stated the affiant's belief that blood, soil, and other unknown evidence could be found in
the van and residence. The affidavit requested permission to seek "blood, soil, and other
unknown evidence." 
          We hold the warrant was not general, as it instructed officers to search for specific
items, i.e., blood and soil. The phrase "other unknown evidence" reasonably related to
those specific items, and in this context, was not so broad as to allow a search that would
offend the protective intent of the Fourth Amendment.
          Further, the only evidence seized from the house and subsequently admitted at trial
were Rodgers' tennis shoes. The right shoe had Amanda's blood on it. Henson testified
Rodgers was wearing the shoes when the search was conducted. Henson asked Rodgers
for his shoes, and Rodgers complied. 
          Rodgers also contends there was no reasonable basis for the warrant to allow a
search of the residence as well as the van parked at the residence. We hold the request
in the affidavit supporting the application for the warrant reasonably sought a search of the
residence and a search of the residence was properly authorized. 
          Considering the totality of the circumstances, as revealed in the complete affidavit,
it was reasonable to seek authorization to search the residence. The affidavit detailed the
circumstances under which Amanda's body was found and the suspicious circumstances
concerning Rodgers' van, i.e., suspected blood in the van and clay on the tires similar to
that seen at the railroad tracks. In light of the short time between Amanda's body being
found and officers seeing suspected blood in Rodgers' van, and clay or mud on the van's
tires similar to that at the railroad tracks, and finding Rodgers at the residence where the
van was parked, the magistrate signing the warrant only a few hours later could reasonably
infer that blood, soil, or other evidence of the murder might have been transported from the
van to the residence. A magistrate may make reasonable inferences from allegations in
an affidavit applying for a search warrant. See Ramos, 934 S.W.2d at 363. 
          Rodgers' search and seizure contentions are overruled.
Change of Venue
          Before trial, Rodgers moved the court to change the venue of this case, asserting
he could not get a fair trial in Wood County. He attached numerous newspaper articles in
support of his motion. We review a trial court's ruling on a motion for change of venue
under an abuse of discretion standard. Salazar v. State, 38 S.W.3d 141, 150 (Tex. Crim.
App. 2001). 
          Rodgers was indicted in October 2001 for Amanda's murder. According to his brief
on appeal, he was also indicted that same month for aggravated sexual assault, alleged
to have been committed on or about March 1, 2001.


 The change of venue issue in the
instant case was argued in two hearings. 
          At the first hearing, held June 10, 2002, Rodgers presented witnesses who testified
Rodgers had been unfairly prejudiced by media coverage of Amanda's death and Rodgers'
alleged involvement. Rodgers' mother, Wanda McKnight, testified she had seen two or
three television news broadcasts concerning her son's case(s) and had spoken to between
twenty-five and thirty people who had seen newspaper coverage of the case. She testified
that Rodgers had not received a fair trial in his aggravated sexual assault case and that the
fact Rodgers was black and Amanda white precluded a fair jury trial in Wood County. In
its cross-examination, the State questioned McKnight regarding her own trial for murder
in Wood County.


 McKnight further admitted she had not spoken to people throughout the
county. 
          Rodgers' uncle, Ronald Harris, whose sister (apparently McKnight) had pled guilty
to murder in Wood County, believed the writers of the publications covering the case had
already decided Rodgers was guilty. He felt that Rodgers would be tried by an all-white
jury and that it was "still like the 60's" in Wood County. He claimed the police in Mineola
picked on black people more than white people. 
          Rodgers presented a family friend, James Gunter, who was a member of the
Mineola school board and was involved with helping underprivileged children. Although
Gunter had not talked to anyone in most of the surrounding communities, he did not think
that a black man married to a white woman could get a fair trial in Wood County. He did
acknowledge it had been at least a year since he had heard any publicity about the case. 
          At the conclusion of this testimony, the trial court recessed the venue hearing until
March 13, 2003. At that hearing, the State controverted Rodgers' evidence with its own
witnesses, including a banker and a retired law enforcement officer. 
          To justify a change of venue based on media attention, a defendant must show that
the publicity about the case was pervasive, prejudicial, and inflammatory. Bell v. State,
938 S.W.2d 35, 46 (Tex. Crim. App. 1996). The evidence presented at the venue hearings
regarding the effect of the publicity in this case was conflicting. The trial court was free to
evaluate the credibility of all the witnesses and their testimony. Because it was not clear
that the media coverage was pervasive, prejudicial, and inflammatory, as required under
Bell, we cannot say the trial court abused its discretion in denying Rodgers' motion to
change venue. 
          We further note that all the newspaper articles attached to Rodgers' motion were
published in the four months following Amanda's death (June–October 2001).


 Rodgers'
trial was held about twenty-one months after Amanda's death. Having reviewed these
articles and the testimony of Rodgers and the State's witnesses, we find the trial court was
within its discretion in denying Rodgers' motion for change of venue. 
Lesser Included Offense
          Rodgers complains the trial court erred in denying his request to have the jury
instructed on the lesser offense of assault. To determine whether a charge on a lesser
included offense should be given, we apply a two-step test. Mathis v. State, 67 S.W.3d
918, 925 (Tex. Crim. App. 2002); see Aguilar v. State, 682 S.W.2d 556, 558 (Tex. Crim.
App. 1985); Royster v. State, 622 S.W.2d 442, 444 (Tex. Crim. App. [Panel Op.] 1981)
(plurality opinion). The first step is to decide whether the offense is a lesser included
offense of the offense charged. See Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon
1981); Mathis, 67 S.W.3d at 925. The second step of the test requires us to evaluate the
evidence to determine whether there is some evidence that would permit a jury rationally
to find that the defendant is guilty only of the lesser offense. Mathis, 67 S.W.3d at 925;
Wesbrook v. State, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000); Moore v. State, 969
S.W.2d 4, 8 (Tex. Crim. App. 1998). Further, the evidence must establish the lesser
included offense as a valid rational alternative to the charged offense. Wesbrook, 29
S.W.3d at 113 (citing Arevalo v. State, 943 S.W.2d 887, 889 (Tex. Crim. App. 1997)).
          A person commits murder if such person: (1) intentionally or knowingly causes the
death of an individual; or (2) intends to cause serious bodily injury and commits an act
clearly dangerous to human life that causes the death of an individual. A person commits
assault if such person "intentionally, knowingly, or recklessly causes bodily injury to
another, including the person's spouse." Tex. Pen. Code Ann. § 22.01(a)(1) (Vernon
Supp. 2004–2005). The offense of assault also includes intentionally or knowingly
threatening another, including the person's spouse, with imminent bodily injury; or causing
offensive or provocative physical contact with another person. Tex. Pen. Code Ann.
§ 22.01(a)(2), (3) (Vernon Supp. 2004–2005). Article 37.09, in relevant part, states that
an offense is a lesser included offense if "it is established by proof of the same or less than
all the facts required to establish the commission of the offense charged." Tex. Code Crim.
Proc. Ann. art. 37.09. 
          Assault can be a lesser included offense of murder. See Hayward v. State, 117
S.W.3d 5, 13 (Tex. App.—Houston [14th Dist.] 2003, pet. granted). Assault is established
by proof of the same or less than all the facts required to establish that an appellant
committed murder as charged in the indictment. See Tex. Code Crim. Proc. Ann. art.
37.09(1); Jacob v. State, 892 S.W.2d 905, 908–09 (Tex. Crim. App. 1995). 
          There was no evidence that, if Rodgers was guilty of a crime, he was guilty only of
assault. In fact, there was no evidence of assault. He argues it is possible Amanda was
cut with the knife she borrowed from Rayburn. But there is no evidence of this. The
medical examiner testified the cause of death was blunt force trauma. She said that such
trauma was consistent with a person being hit by a train and that some of the injuries were
consistent with her being run over by a motor vehicle such as a van. It was impossible to
"separate out" whether death was caused by the train, the vehicle, or a combination of
both. 
          Rodgers did not testify and presented no evidence raising the lesser included
offense of assault. The trial court did not err in refusing the request for an instruction on
a lesser included offense. 
Donation of Jurors' Compensation
          Rodgers complains of the practice of the Wood County District Clerk in soliciting 
members of the jury panel to donate their juror pay to child and victim compensation funds.
Rodgers concedes this Court has previously rejected these arguments (see Harvey v.
State, 123 S.W.3d 623 (Tex. App.—Texarkana 2003, pet. ref'd)), and states he makes
these points solely to preserve them for possible federal review. We decline to address
these issues further. See also Ruckman v. State, 109 S.W.3d 524 (Tex. App.—Tyler 2000,
pet. ref'd).
Denial of Additional Strikes
          Rodgers makes only a cursory explanation of how his rights were violated by the trial
court's denial of additional strikes during jury selection. We find this issue inadequately
briefed and decline to address it. See Tex. R. App. P. 38.1(h); Vuong v. State, 830 S.W.2d
929, 940 (Tex. Crim. App. 1992).
Victim's Statements
          In a supplemental issue, Rodgers cites the United States Supreme Court's recent
holding in Crawford v. Washington and asserts that testimony of witnesses Rayburn and
Wilson, relating statements of Amanda, violated the holding of that case and the
Confrontation Clause. Crawford held that the Confrontation Clause in the Sixth
Amendment to the United States Constitution barred from admission into evidence
testimonial statements of a witness who did not appear for trial unless the witness was
unavailable to testify and the defendant had a prior opportunity for cross-examination.
Crawford v. Washington, 541 U.S. 36, 52–53 (2004). 
          Crawford "leave[s] for another day . . . a comprehensive definition of 'testimonial.'"
Id. at 68. However, the Court did note that "the term covers . . . at a minimum . . . prior
testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police
interrogations. These are the modern practices with closest kinship to the abuses at which
the Confrontation Clause was directed." Id. 
          Rodgers complains that testimony from Wilson and Rayburn, relating statements
made by Amanda within the two days before her death, were hearsay not permitted
following Crawford. See Wiggins v. State, 152 S.W.3d 656 (Tex. App.—Texarkana 2004,
no pet.). The statements of which Rodgers complains were made by the victim to a family
member and a coworker before any possible prosecution of Rodgers and were not
expected to be used in judicial proceedings. By definition, these statements were not
testimonial and therefore do not implicate Crawford.
Conclusion
          We affirm the judgment.


                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      February 16, 2005
Date Decided:         March 25, 2005

Publish