

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-10-00218-CR

_____

SHANNON KEITH FINLEY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Sixth Judicial District Court
Lamar County, Texas
Trial Court No. 23569

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Shannon Keith Finley was convicted by a jury for a third offense or more, repeat offender driving while intoxicated (DWI) offense (TEX. PENAL CODE ANN. §§ 12.42, 49.09(b) (West Supp. 2011) and was sentenced to seventeen years' imprisonment. On appeal, Finley raises four points, arguing that the trial court should have: (1) granted his motion for change of venue, (2) granted his motion to suppress the evidence springing from a traffic stop which led to his arrest, (3) included an instruction in the jury charge to allow the jury to consider a factual question of whether the traffic stop was legal, and (4) excluded the results of Finley's blood test, which was drawn by a person whom Finley alleges was not qualified to do so.

After considering Finley's points, we affirm the judgment of the trial court.

## I.      Change of Venue Not Mandatory

The facts giving rise to Finley's motion for change of venue have their origins in an accusation that Finley had committed murder—an accusation which was later dropped. In 2008, the "severely damaged" body of Brandon McClelland, an African-American man, was found in the middle of a farm road in Lamar County. Caucasians Finley, and his then-alleged co-conspirator, Ryan Crostley, were charged in the supposed dragging death of the decedent because they were the last people seen with McClelland while he was alive. News concerning the circumstances surrounding McClelland's death sparked racially charged riots and protests, which received widespread media coverage. Finley and Crostley were arrested and spent eight months

2

in jail "before all charges were dropped after a gravel truck driver came forward with information he may have been the one that struck McClelland."

Due to the revelation by the gravel truck driver, the murder charges were dropped in June 2009. Finley alleges that "[b]y the Fall of 2009, it was known in the Paris, Texas law enforcement community that Finley and Crostley were planning to file a civil rights action against individuals involved in their prosecution." On October 19, 2009, Finley and Crostley, who were driving separate vehicles, were both independently stopped and arrested for DWI within close temporal proximity of each other. Finley and Crostley sued Lamar County District Attorney Investigator Chris Brooks, Texas Department of Public Safety Trooper Stacy McNeal, and special prosecutor Toby Shook for false imprisonment and malicious prosecution in January 2010. The lawsuit sparked further publicity. Citing the publicity concerning the death of McClelland and his arrest and release, together with media publicity regarding the lawsuit Finley had filed, Finley maintained that he could not receive a fair trial in Lamar County and moved for a change of venue.

"To prevail on a motion to change venue, a defendant must show an inability to obtain an impartial jury or a fair trial in the place of venue." *Salazar v. State*, 38 S.W.3d 141, 149–50 (Tex. Crim. App. 2001) (citing *Willingham v. State*, 897 S.W.2d 351, 357 (Tex. Crim. App. 1995)). We review a trial court's ruling on a motion for change of venue under an abuse of discretion standard. *Id.* at 150.

"When outside influences affecting the community's climate of opinion as to a defendant

3

are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial." *Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996). However, the mere fact that media attention has been aroused does not "automatically establish prejudice or require a change of venue; jurors do not have to be totally ignorant of the facts and issues of a particular case." *Id.* Rather, "to justify a change of venue based on media attention, a defendant must show that the publicity about the case was pervasive, prejudicial and inflammatory." *Salazar*, 38 S.W.3d at 150 (citing *Bell*, 938 S.W.2d at 46). "The trial court may use voir dire to help gauge the community climate; however, regardless of the successful qualification of a jury panel, the evidence adduced during the venue hearing may show that a change of venue is necessary to assure a fair trial." *Bell*, 938 S.W.2d at 46.

In support of his motion to transfer venue, Finley attached two news articles. The first of these articles was published October 21, 2009, in the Paris newspaper.[1] This article reminded readers that while Finley and Crostley "became widely known after their arrest in the death of McClelland," both consistently maintained their innocence, and the "charges were dismissed after a truck driver came forward to say he might have been the one to hit McClelland." The article went further to state that the duo "were charged with McClelland's death in part because of acquaintances who told police the two men talked about his death and were the last people to be with McClelland on the night he died." The second news item was a January 21, 2010, newspaper

---

[1]Paris is the county seat of Lamar County and its principal municipality.

article in the same newspaper that announced Finley's DWI indictment, identifying him as "a key figure in the investigation of the 2008 death of Brandon McClelland." The State filed an affidavit challenging the contention in the motion that the local populace had been so tainted by the publicity that Finley would be unable to obtain a fair trial.

The evidence presented at the venue hearing included not only the October 21, 2009, news article, but three others published by the same newspaper on January 22, 2010, January 27, 2010, and November 10, 2010. The January 22 and November 10 articles repeated the news that Finley had been arrested and charged in this case with DWI, had been charged in McClelland's death, and that the murder charge was dropped after a truck driver admitted that his vehicle might have struck McClelland. In addition to listing these facts, the January 27 article discussed the lawsuit filed by Finley and Crostley alleging "there was no significant evidence against them, but they were subjected to months in jail, defamation and untrue accusations despite the fact that there was no evidence."

Finley also introduced the testimony of private investigator Ray Ball, who investigated the murder charges. After speaking with "a lot of people" representing "a pretty good cross sample of the community" with respect to "the issue of a fair trial," Ball testified,

> There's a lot of racial tensions brought into town with [Finley's and Crostley's] names connected to it. . . . After the arrest on the DWI, the people I came into contact who were not even involved in the case with [Crostley] and [Finley] both—from both sides—they seemed to build their resentment to—if they were against these two young men, it cemented their beliefs. If they were for these young men, they were confused and not understanding the situation, how it could

5

have happened, et cetera.

During voir dire, eleven hands were raised when the veniremembers were asked whether they knew Finley or if they had read his name in the newspaper. Nine of those were stricken for cause, but no challenge for cause was granted as to two of them (who both swore that they could remain neutral). A few struck veniremembers had seen Finley's name in the paper, and at least one had formed the opinion that he was an habitual offender. On the other side of the spectrum, one stricken veniremember stated he knew of the attempted prosecution of Finley regarding the dragging death and felt "like he's just being targeted now." In any event, none of these veniremembers were seated on the panel of twelve,[2] and there were no objections to the panel.

To justify a change of venue based on excessive media attention, a defendant must show that the publicity about the case was pervasive, prejudicial, and inflammatory. *Rodgers v. State*, 162 S.W.3d 698, 712 (Tex. App.—Texarkana 2005), *aff'd*, 205 S.W.3d 525 (Tex. Crim. App. 2006). Where evidence as to the effect of media coverage is conflicting, the trial court (who is free to evaluate the credibility of all the witnesses and their testimony) does not abuse its discretion in denying a motion to change venue. *Id.* All of the articles presented by Finley were clear in one aspect—the murder charges against Finley were dropped due to the admission by the truck driver that he might have killed McClelland, an explanation that would have exculpated Finley of responsibility in the death. The evidence regarding the effect of the publicity in this case created mixed reactions as to Finley's guilt or innocence—a fact confirmed by Ball's testimony. Because

---

[2]One of the veniremembers who knew Finley from the paper but swore neutrality was listed as an alternate juror.

the effect of the media publicity was conflicting and none of the seated members of the jury had heard of Finley, the trial court could find that Finley did not show an inability to obtain an impartial jury or a fair trial. *Salazar*, 38 S.W.3d at 150; *Rodgers*, 162 S.W.3d at 712. Therefore, there was no abuse of discretion in denying Finley's motion to change venue.

We overrule Finley's first point of error.

## II. No Error in Overruling Motion to Suppress

We review a trial court's decision on a motion to suppress evidence by applying a bifurcated standard of review. *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd). While we defer to the trial court on its determination of historical facts and credibility, we review its application of the law and determination on questions not turning on credibility de novo. *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); *Graves*, 307 S.W.3d at 489. We also afford deference to a trial court's "application of law to fact questions" (also known as "mixed questions of law and fact") if the resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. Since all the evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold the denial of Finley's motion to suppress if it was supported by the record and was correct under any theory of law applicable to the case. *Carmouche*, 10 S.W.3d at 327–28; *State v. Ballard*, 987

S.W.2d 889, 891 (Tex. Crim. App. 1999).

Law enforcement officers may stop and briefly detain persons suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). To initiate an investigative stop, the officer must possess a reasonable suspicion based on specific, articulable facts that, in light of the officer's experience and general knowledge, would lead the officer to reasonably conclude that the person detained actually is, has been, or soon will be engaged in criminal activity. *United States v. Sokolow*, 490 U.S. 1, 10 (1989); *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). These facts must be more than a mere hunch or suspicion. *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997).

Whether the officer's suspicion was reasonable is evaluated based on "an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists." *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). It should also be based on the totality of the circumstances. *See Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).

At the suppression hearing, Officer James Cole Sain testified that Finley's conduct attracted his attention at "ten or eleven o'clock" at night because he was "swerving within his lane" and made an "unusually wide right turn." This action prompted Sain to turn on the in-unit video camera. Our review of the video recording demonstrated that Finley weaved within his lane.

8

Based upon his training and experience, Sain believed that Finley was driving while intoxicated.

Finley argues that the video recording fails to establish that Finley committed any violation of the Texas Transportation Code.[3] However, there is no requirement that a traffic regulation be violated before an officer has reasonable suspicion to justify a stop of a vehicle. *State v. Alderete*, 314 S.W.3d 469, 473 (Tex. App.—El Paso 2010, pet. ref'd) (police officers trained to detect persons driving while intoxicated had reasonable suspicion to stop driver suspected of driving while intoxicated after observing driver continuously swerving within a lane for a distance of one-half mile, even though driver did not violate any traffic regulations). Finley also cites to cases relying on alleged Texas Transportation Code violations as the basis for the stop. Yet, Sain stopped Finley for suspected DWI. An officer is justified in stopping a driver based on a reasonable suspicion of DWI, even in the absence of a traffic violation. *James v. State*, 102 S.W.3d 162, 172 (Tex. App.—Fort Worth 2003, pet. ref'd); *Cook v. State*, 63 S.W.3d 924, 929 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

As the finder of fact, the trial court could have taken Sain's observations of Finley's conduct prior to the start of the video recording as credible. Based upon the testimony, it could have found that weaving within a lane and making an unusually wide turn during the night hours would objectively lead a reasonable officer to conclude that Finley was not under the full control

---

[3]Sain also testified Finley "drove on the improved shoulder, which is a ticketable offense," drove on the improved median, and changed lanes within 100 feet of an intersection. Finley's arguments attempt to refute the testimony regarding some of the Texas Transportation Code violations, but does not rebut the contention that Finley was swerving within his lane prior to the start of the video recording. Further, Finley admits that "he touched the fog line."

of his faculties due to intoxication. Moreover, after our review of the video recording—which we believe demonstrates that Finley's car was weaving within the lane—we cannot say that the trial court abused its discretion in overruling the motion to suppress. This point of error is overruled.

### III.   Finley Not Entitled to an Article 38.23 Jury Instruction

Texas Code of Criminal Procedure Article 38. 23(a) provides:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005).

An Article 38.23 jury instruction is mandatory only when there is a factual dispute regarding the legality of the search. *Pickens v. State*, 165 S.W.3d 675, 680 (Tex. Crim. App. 2005); *Brooks v. State*, 642 S.W.2d 791, 799 (Tex. Crim. App. [Panel Op.] 1982); *Malone v. State*, 163 S.W.3d 785, 802 (Tex. App.—Texarkana 2005, pet. ref'd). To be entitled to the submission of a jury instruction under Article 38.23(a), a defendant must establish:

(1)   The evidence heard by the jury must raise an issue of fact;

(2)   The evidence on that fact must be affirmatively contested; and

(3)   That contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence.

*Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007) (citations omitted).

During trial, Sain testified again that he believed Finley might be intoxicated because he

10

was "weaving within [his] lane," and made a "strange, wide right turn." He clarified that although the described actions were not illegal, the conduct raised his suspicion that the driver of the vehicle might be intoxicated. He said he believed that he observed Finley commit a traffic violation when he "changed lanes within the intersection," "hit the fog line," "drove on an unimproved shoulder," and "made contact with the yellow divider in the center of the road."

In rebuttal to this, Finley called private investigator and former police officer Ray Ball as an expert to testify that he reviewed the arrest video recording made by Sain and found no "reasonable suspicion of any illegal or criminal activity going on." Ball testified,

> I then looked for - - the most common thing you see with a DWI is weaving in a line of traffic, unable to maintain a straight pathway. In this particular three or four or five minutes of video that I watched, the only time that Mr. Finley deviated from the lane he was in, was - - or within the lane he was in was when he signaled and changed lanes. . . . I did not see him using the white line as a reference - - the white line on the right side of the road. I did not see him vary too close or vary far from it. He just selected a position, and within reasonable inches probably - - nothing was obvious that he weaved within the single lane of traffic.

"Jury submission . . . is only required when facts are raised that are necessarily determinative of the admissibility of the challenged evidence." *Madden*, 242 S.W.3d at 510, n.16. Ball's testimony—the sole evidence introduced to contest or question the reasonableness of the traffic stop—addressed only the events contained in Sain's video recording, not Finley's earlier driving, which occurred before the recording commenced. Therefore, Ball's testimony could not have raised any fact issue with regard to Sain's stated justifications for the traffic stop, which were based wholly on that part of Finley's driving that antedated the video recording.

11

Sain's uncontested testimony that Finley was weaving within his lane and made an unusually wide turn at times not recorded by the video recording was sufficient to support the legal conclusion that the stop was based upon reasonable suspicion. Therefore, although Ball's testimony may have raised issues of fact, meeting the first two elements of *Madden*, the factual issues raised by Ball cannot be considered "material to the lawfulness of the challenged conduct in obtaining the evidence" because it did not address some of the bases alleged by Sain to have been the reason for the traffic stop. *Madden*, 242 S.W.3d at 510 n.12 (citing *Merriweather v. State*, 501 S.W.2d 887, 891 (Tex. Crim. App. 1973) (when specific facts used by the court to determine existence of probable cause were uncontested, defendant not entitled to jury instruction concerning other facts—which were contested—that did not defeat the finding of probable cause).

We find no error in refusal of the Article 38.23 jury instruction. Finley's second point of error is overruled.

## IV. No Error in Admitting Finley's Blood Test Results

After the arrest, Sain transported Finley to the Paris Regional Medical Center to "have a licensed technician draw his blood." Finley argues that the trial court erred in admitting the results of a blood test[4] over his objection that the blood was "drawn illegally under Article 38.23" by Jennifer Neighbors, who was not a certified phlebotomist. A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *Casey v. State*, 215 S.W.3d 870,

---

[4]Finley's blood alcohol level was 0.13.

12

879 (Tex. Crim. App. 2007). An abuse of discretion occurs when the trial court's decision lies outside the zone of reasonable disagreement. *Id.*

Section 724.017 of the Texas Transportation Code provides that "[o]nly a physician, qualified technician, chemist, registered professional nurse, or licensed vocational nurse may take a blood specimen at the request or order of a peace officer under this chapter." TEX. TRANSP. CODE ANN. § 724.017(a) (West 2011). Referring to this section, the trial court opined that Neighbors could be considered a "qualified technician" and, therefore, qualified to draw blood specimens. However, a phlebotomist is not automatically considered to be a qualified technician under the statute. *Cavazos v. State*, 969 S.W.2d 454, 456 (Tex. App.—Corpus Christi 1998, pet. ref'd). We look to the evidence in the record presented on the phlebotomist's training and experience. *State v. Johnson*, 336 S.W.3d 649, 663 (Tex. Crim. App. 2011).

Neighbors, a certified nurses' assistant, testified that she worked at the hospital in 2009 as a phlebotomist, and described in detail the process used to draw Finley's blood. Although Neighbors had not been certified by the licensing authorities as a phlebotomist, she was "trained by the hospital" as a phlebotomist and was supervised by a certified phlebotomist, who was present at the time the blood was drawn. We note that Section 724.017 of the Texas Transportation Code, in including "qualified technician" among those authorized to draw blood, makes no requirement that the technician be licensed or certified, only that they are qualified to perform the task.

13

A sister court addressing this same issue has recently stated, "we know of no authority for excluding from evidence the results of analyses performed on blood specimens drawn by phlebotomists who do not possess licenses issued by the State." *Turnbow v. State*, No. 02-09-00438-CR, 2010 WL 4486223, at *3 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op., not designated for publication). Our independent research reveals no authority requiring exclusion. Rather, the caselaw suggests that certification is not required if qualification is demonstrated through specific training and experience as a phlebotomist. *Johnson*, 336 S.W.3d at 663; *see State v. Bingham*, 921 S.W.2d 494, 496 (Tex. App.—Waco 1996, pet. ref'd) ("the common-sense interpretation of the term 'qualified technician,'. . . must include a phlebotomist who a hospital or other medical facility has determined to be qualified in the technical job of venesection or phlebotomy, i.e., the drawing of blood"); *Jackson v. State*, No. 08-07-00061-CR, 2009 WL 1552890, at *4 (Tex. App.—El Paso June 3, 2009, no pet.) (mem. op., not designated for publication).[5]

The Texas Court of Criminal Appeals has recently explained that a defendant who moves to suppress blood test results under Article 38.23 on the allegation that the person drawing blood is unqualified "has the burden of producing evidence of a statutory violation." *State v. Robinson*, 334 S.W.3d 776, 779 (Tex. Crim. App. 2011). Considering Neighbors' testimony, we cannot say that the trial court abused its discretion in finding that Finley did not meet that burden, or in finding

---

[5]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

14

that Neighbors was qualified to draw Finley's blood.

Finley's last point of error is overruled.

## V.     Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:      December 5, 2011
Date Decided:        December 20, 2011

Do Not Publish